UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID J. KENNEDY,

      Plaintiff,                   Case No. 2:19-cv-13210

                                      District Judge Sean F. Cox

v.                              Magistrate Judge Kimberly G. Altman

LT. CURTIS,

      Defendant.

_____/

## REPORT AND RECOMMENDATION TO DENY DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT (ECF No. 52)

I.     Introduction

This is a prisoner civil rights case under 42 U.S.C. § 1983. Plaintiff David J. Kennedy (Kennedy), at the time proceeding *pro se*, filed a complaint alleging that Defendants Anthony Stewart (Stewart), Kevin Lindsey (Lindsey), Josh Curtis (Curtis), and Robert Mask (Mask) violated his constitutional rights. Specifically, he alleged that he was retaliated against for protected speech, subjected to cruel and unusual punishment in violation of the Eighth Amendment, and denied due process under the Fourteenth Amendment. *See* ECF No. 1. All of Kennedy's claims except for his retaliation claim against Curtis have been dismissed. *See* ECF No. 5.

1

Under 28 U.S.C. § 636(b)(1), all pretrial matters were referred to the undersigned.  (ECF No. 25).  Before the Court is Curtis' second motion for summary judgment.  (ECF Nos. 52, 53).[1]  The motion is fully briefed, (ECF Nos. 58, 60, 65), and was the subject of a hearing.

For the reasons that follow, the undersigned RECOMMENDS that Curtis' motion be DENIED.

## II.    Background

### A.    Overview

This case centers around a Class I misconduct ticket written by Curtis alleging that on August 31, 2017, Kennedy created a disturbance and exhibited threatening behavior when he threatened to stab other prisoners if they attended lunch or dinner.  *See* ECF No. 1, PageID.72.  Also on this date, officials at the G. Robert Cotton Correctional Facility (JCF) were investigating the Level II prison population's low lunch turnout.  *See* Critical Incident Report, ECF No. 52, PageID.655-726.  The low turnout was believed to be related to inmate

---

[1] Curtis first moved for summary judgment on the grounds that Kennedy failed to exhaust his administrative remedies.  (ECF No. 20).  The undersigned recommended that the motion be denied, (ECF No. 28), and the District Court adopted the recommendation over Curtis' objections, (ECF No. 32).  Thereafter, Kennedy filed a motion for the appointment of counsel, (ECF No. 34), which the undersigned granted, (ECF No. 36).  Two attorneys accepted Kennedy's case, (ECF Nos. 39, 40), and the parties engaged in discovery.  After the close of discovery, Curtis filed a motion requesting leave to file a second dispositive motion, (ECF No. 44), which the undersigned granted, (ECF No. 50).

dissatisfaction over food quality and service at JCF.  (*Id.*, PageID.658).  Curtis was

involved with the investigation and submitted a "Critical Incident Participant

Report" documenting his placement of "Swackhammer and Kennedy in

segregation pending investigation."  (*Id.*, PageID.685).

At the time of the alleged disturbance, Kennedy was serving as a

representative for his housing unit.  As a representative, Kennedy's role was "to

assist housing unit staff in identifying and resolving problems which exist[ed] in

the unit."  (PD 04.01.150, ECF No. 52, PageID.639).  The Warden of JCF has the

authority to "remove a prisoner who engages in conduct which otherwise

jeopardizes the custody, security, or good order of the facility" from his role as a

housing unit representative.  (*Id.*, PageID.640).

Additionally, the Michigan Department of Corrections (MDOC)

"encourage[s] [representatives] to solicit input from those they represent and to

give consideration to the views expressed."  (*Id.*, PageID.640).  Representatives,

however, are not allowed to "use their position[s] to present individual complaints

to the administration."  (*Id.*).  Housing unit representatives are also members of the

Warden's Forum, which "meet[s] with the Warden at least monthly to discuss

matters of concern to the general prisoner population."  (*Id.*, PageID.640-641).

B.     The Record

1.     Deposition Testimony

a.     David Kennedy

Kennedy testified that he became a housing unit representative sometime in either 2016 or 2017.  (Kennedy Deposition, ECF No. 58-5, PageID.1052).  After becoming a representative, Kennedy was selected to serve on the Food Service Committee.  (*Id*., PageID.1052-1053).  Members of this committee were supposed to "evaluate the food and bring grievances from the population to the food service staff concerning the food[.]"  (*Id*., PageID.1053).

On or around August 29, 2017, Kennedy encountered Curtis while he was walking to the dining hall.  (*Id*., PageID.1055-1056).  Kennedy testified that Curtis "told [Kennedy] that people were pissed off, very upset about [his] complaints on the Forum and that [he] shouldn't make any more complaints and [he] wasn't untouchable because he was a Warden's Forum member and basically said that . . . if [he] didn't cease in what [he] was doing that things would be very difficult for him[.]"  (*Id*., PageID.1056).  Then, the next day, Kennedy attended a Warden's Forum meeting where he complained about food quality.  (*Id*., PageID.1057).

One day later, on August 31, 2017, Sergeant Roland Houtz (Houtz) approached Kennedy's cell, ordered Kennedy to step out of the cell, and then cuffed Kennedy.  (*Id*., PageID.1058).  Kennedy "asked him what's going on," and

4

Houtz "said something to the effect about [he] had pissed Lieutenant Curtis off . . . and that he was given orders to take [him] to segregation." (*Id*.).

### b.     Josh Curtis

Curtis testified that at all times relevant to this case he was employed by the MDOC at JCF in the role of an acting lieutenant. (Curtis Deposition, ECF No. 52, PageID.623-625). Curtis said that he did not know Kennedy "on a personal level at all[,]" and did not believe that he had "ever had a conversation with [him]" or had spoken to him regarding his Warden's Forum activity. (*Id*., PageID.626; Curtis Deposition, ECF No. 58-4, PageID.1034). Curtis also said he did not know that Kennedy was the housing unit representative for Unit H, and that he "never really got involved [with] or spoke to the warden's forum ever at [JCF]" because he was "[j]ust too busy." (ECF No. 52, PageID.626-627).

Curtis recalled that in late summer of 2017, "there were complaints about the food" at JCF. (*Id*., PageID.628-629). The complaints about food first began in 2015, when food service was privatized at MDOC facilities. (*Id*.). Curtis and the other corrections officers had "[a] lot" of conversations about food quality at JCF. (*Id*., PageID.629). Curtis believed that the prisoners being upset about the food quality affected "the safety [of JCF staff] on a daily basis." (*Id*., PageID.629-630). This was because "[w]hen you have that many people angry all at the same time, that can be very dangerous." (ECF No. 58-4, PageID.1033). Overall, Curtis

believed that the food quality issues "made [his] job more difficult[.]"  (*Id.*).

On or around August 31, 2017, Curtis observed "a disturbance in the prison[,]" and that, even though "it was a peaceful disturbance, . . . it was a very tense and scary situation."  (ECF No. 52, PageID.631).  Curtis explained that "[t]he prisoners were not eating[,]" and that "[t]here were a lot of rumors out there." (*Id.*).

While he was in the yard, a prisoner approached Curtis and informed him that Kennedy and another prisoner, Swackhammer, "were two of the people responsible for organizing the disturbance[.]"  (*Id.*, PageID.631, 634).[2] Specifically, the informant told Curtis that "Swackhammer and Kennedy were walking around in the morning yard instructing other prisoners if they went to lunch or dinner they would be stabbed."  (ECF No. 58-4, PageID.1040).  Curtis brought the informant to Deputy Wardens Doug Smith and Lindsey to discuss the information.  (ECF No. 52, PageID.631-632).

After speaking with the informant, Smith and Lindsey instructed Curtis to have Kennedy and Swackhammer "put in temp seg pending investigation."  (*Id.*, PageID.631).  Smith and Lindsey also "told [Curtis] to get the tickets written[.]" (*Id.*).  Curtis followed these instructions.  (*Id.*; ECF No. 58-4, PageID.1034).

---

[2] Curtis knew the informant "pretty well[,]" and the informant frequently provided Curtis with information that Curtis found to be "pretty accurate."  (ECF No. 52, PageID.634-635).

On or around the following day, the informant refused to speak with Curtis. (ECF No. 52, PageID.632).  The informant "was no longer compliant." (*Id*.).  The informant told Curtis that "people figured out that he's talking, and he's scared to death." (*Id*.).  Ultimately, the informant "refus[ed] to give any more information or put it in writing." (*Id*.).

 Based on the original information from the informant, Curtis wrote misconduct tickets against Kennedy and Swackhammer.  (*Id*., PageID.632-633).  However, despite writing the tickets, Curtis testified that he did not "believe that [the tickets] would be sustained by a hearing officer[.]" (*Id*., PageID.633).  Even though Curtis no longer "fe[lt] comfortable filing a misconduct" ticket against Kennedy, he did so anyway because he had been told to do so by Smith and Lindsey.  (*Id*.; ECF No. 58-4, PageID.1037-1038).  Curtis "was a little" surprised that Lindsey and Smith asked him to write the misconduct tickets once the informant refused to cooperate.  Curtis did not mention Smith or Lindsey in the misconduct tickets, explaining that he did not feel their names were "relevant," and because he does not "make a point of picking a fight with people that outrank [him]." (ECF No. 52, PageID.633; ECF No. 58-4, PageID.1050).

Curtis also admitted that he did not do any other investigation before writing the misconduct tickets. (ECF No. 58-4, PageID.1048-1049).  For example, he did not talk to either Kennedy or Swackhammer or otherwise attempt to verify the

7

informant's allegations.  (*Id.*).

### c.     Roland Houtz

Houtz, a retired MDOC corrections officer from JCF, testified that "[a] lot of times," housing unit representatives "took advantage of their position[s][.]" (Houtz Deposition, ECF No. 52, PageID.646-647; Houtz Deposition, ECF No. 58-2, PageID.1001).  He also testified that he did not remember Kennedy specifically, but that he did remember Unit H as a "calmer [unit]."  (ECF No. 52, PageID.647; ECF No. 58-2, PageID.1007, 1009-1010).

### d.     Robert Mask

Mask, an MDOC corrections officer at JCF, testified that, unless he was working on a particular housing unit, he did not know which prisoners were serving as housing unit representatives.  (Mask Deposition, ECF No. 52, PageID.653-654).  This was because they "change every eight months to a year[.]" (*Id.*, PageID.654).

### 2.     Hearing Reports

Approximately two weeks later, on September 13, 2017, Hearing Officer Marutiak held a hearing on the misconduct ticket that charged Kennedy with both threatening behavior and creating a disturbance.  *See* ECF No. 20-4.  Kennedy attended the hearing, (*Id.*, PageID.201); Curtis did not.

After considering evidence submitted both before and during the hearing,

Officer Marutiak found Kennedy not guilty.  (*Id*.).  Officer Marutiak explained his

findings as follows:

> The record present reveals quite justifiable reasons for dismissal of
> these charges based on substantive due process grounds, including the
> facility's failure or refusal to respond to requests for information from
> the Hearings Investigator.  [Kennedy] did present his defense and this
> matter was schedule[d] for the final day for a timely hearing, however.
> [Kennedy] is therefore entitled to determinations based on the merits of
> the charges.
>
> HO finds absolutely no credible or substantial evidence in the record
> for the factual allegations.  There is no allegation in the misconduct
> report sufficient to even support the (432) [creating a disturbance]
> charge.
>
> The facility's contentions are exclusively based on Lt. Curtis' report of
> a double-hearsay report from a "confidential informant" [it is noted
> parenthetically that the MDOC does not sanction the use of
> "informants"; the MDOC does have and use "confidential witnesses"]
> that prisoners . . . Kennedy and Swackhammer . . . while on the yard on
> 08/31/17, threatened to "stab" other prisoners if they attended the lunch
> or dinner meal. . . .
>                                             …
> The record documents that the Hearings Investigator sent numerous
> very relevant and critical questions to [Curtis] regarding the need to
> question the witness.  The record further shows that the facility failed
> or refused to respond.  [Kennedy's] claims and defenses were not
> meaningfully investigated.
>                                             …
> The record here easily gives rise to the inferences that either the facility
> did not in fact have a "confidential informant", or that the facility did
> not itself have confidence in the witness's verbal report to Lt. Curtis, or
> that there was a reason other than the integrity of the misconduct
> hearing process for bringing the charges, confining the prisoner and
> failing to cooperate afterwards.  Regardless of which inference is more
> correct, it was a misuse of the hearings process.

(*Id*., PageID.201-202).

Officer Marutiak also found Swackhammer not guilty on his misconduct ticket after reviewing video evidence showing that he was at work rather than in the yard during the period he and Kennedy were allegedly threatening other prisoners. (ECF No. 52, PageID.771-772). Officer Marutiak also noted Curtis' refusal to answer questions and respond to requests for information regarding Swackhammer's misconduct ticket. (*Id*.).

### 3.    Affidavits

Alonzo Carter (Carter) and James Cohen (Cohen) are inmates at JCF who were housed in Housing Unit H during the relevant period. (ECF No. 1, PageID.19-20). Both submitted affidavits in support of Kennedy. (*Id*.).

Carter and Cohen explained that they voted for Kennedy to serve as their housing unit representative and that they asked for his assistance after he was elected. (*Id*.). Neither Carter nor Cohen were able to present their own grievances due to their "lack of education and understanding" of the law and MDOC policies and rules, so they sought out Kennedy in his capacity "as the H-Unit Housing Unit Representative/Warden's Forum's Member" to present their grievances to the JCF administration and then help them understand the administration's responses. (*Id*.).

### III.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of material fact exists. . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotation marks omitted); cf. Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact," the court may "consider the fact undisputed for purposes of the motion"). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.' " *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## IV.    Discussion

Curtis argues that Kennedy has failed to meet all three elements required to prove a retaliation claim under the First Amendment. He also argues that he is

entitled to qualified immunity.[3]

### A.    First Amendment – Retaliation

#### 1.    Standard

" '[A]s a general matter the First Amendment prohibits government officials

from subjecting an individual to retaliatory actions' for engaging in protected

speech." *Nieves v. Bartlett*, ___ U.S. ___, 139 S. Ct. 1715, 1722 (2019) (quoting

*Hartman v. Moore*, 547 U.S. 250, 256 (2006)).  A First Amendment retaliation

claim has three elements:

> (1) the plaintiff engaged in protected conduct;
>
> (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and
>
> (3) there is a causal connection between elements one and two -- that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

---

[3] Curtis also argues that Kennedy failed to establish his due process claim. However, it is not necessary to address this argument because Kennedy's due process claim did not survive the screening process. *See* ECF No. 5.  And, even if it had, Kennedy did not discuss this argument in his response to the instant motion, so any opposition to summary dismissal of this claim would be deemed waived. *See Brown v. Gojcaj Foods, Inc.*, No. 09–14537, 2011 WL 1980533, at *3 (E.D. Mich. May 20, 2011) ("If a party fails to respond to an argument raised in a motion the court can assume that opposition to the motion is waived and the motion may be granted." (citing *Humphrey v. U.S. Attorney Gen.'s Office*, 279 F. App'x 328, 331 (6th Cir.2008))).

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).  Each element will be

addressed in turn below.

2.    Application

a.    Overview

The District Court considered Kennedy's retaliation claim at the screening

stage and concluded it could go forward at that time, explaining in relevant part:

> As to the first element, a prisoner's assistance to other inmates in
> his role as a Warden's Forum representative is protected conduct. *King
> v. Zamiara*, 150 F. App'x 485, 492 (6th Cir. 2005).
>
> As to the second element, "[w]hether a retaliatory action is
> sufficiently severe to deter a person of ordinary firmness from
> exercising his or her rights is a question of fact" best left to the jury to
> decide. *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002).  The Sixth
> Circuit has held that, "[i]n the prison context, an action comparable to
> transfer to administrative segregation would certainly be adverse,"
> *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999) (en banc), and
> that actions that result in "more restrictions and fewer privileges for
> prisoners" are also considered adverse. *Hill v. Lappin*, 630 F.3d 468,
> 474 (6th Cir. 2010).
>
> Finally, [Kennedy] clearly makes allegations sufficient to sustain
> the third element as he asserts that other corrections officers told him
> that he was issued the false misconduct charge specifically because
> Defendant Curtis was upset about his complaints at the forum.
>
> Accordingly, the case may proceed against Defendant Curtis on
> [Kennedy's] First Amendment retaliation claim.

(ECF No. 5, PageID.106).

While the District Court's analysis was made at the screening, rather than

summary judgment, stage, it is just as accurate now as it was then.  As explained in

more detail below, Kennedy has offered evidence sufficient to survive summary judgment.

### b. Protected Conduct

In support of his argument that Kennedy did not engage in protected conduct, Curtis cites *Cromer v. Dominguez*, 103 F. App'x 570 (6th Cir. 2004) (unpublished order) and *VanDiver v. Martin*, 48 F. App'x 517 (6th Cir. 2002) (unpublished order). Putting aside that these are both unpublished decisions, they are readily distinguishable.

In *Cromer*, the plaintiff, a prisoner in MDOC custody, sued numerous MDOC employees "alleg[ing] that the defendants conspired to retaliate against [him] for performing his duties as a 'unit representative.' " 103 F. App'x at 571. The Sixth Circuit determined that the plaintiff failed to establish that he was engaged in protected activity or that he suffered an adverse action, explaining:

> The record fails to establish such a claim because [the plaintiff] has not established that he was engaging in protected First Amendment activity as a warden's forum representative. [The plaintiff] has no liberty or property interest in his position as a unit representative on the warden's forum. Furthermore, [the plaintiff] has no First Amendment right to represent other inmates in presenting their grievances absent a showing that the inmates receiving the assistance would otherwise be unable to pursue legal redress. [The plaintiff] has not demonstrated that the inmates he represented on the warden's forum could not have been represented by another inmate, or that they could not bring any concerns they may have to the attention of prison officials without [the plaintiff's] assistance. Even if [the plaintiff] was engaged in protected conduct when he advised and assisted other prisoners in his capacity as unit representative, the complained of adverse actions were *de minimis*

14

impositions which would not deter a person of ordinary firmness from
continuing to serve as a unit representative.

*Id*. at 573 (cleaned up).

*VanDiver* was another case brought by a Michigan prisoner against
numerous MDOC employees.  48 F. App'x at 518.  There, the plaintiff alleged that
his "security classification was increased and he was transferred from one housing
unit to another in retaliation for [his] outspoken involvement in a 'warden's forum'
(where [he] served as his housing unit's representative), for filing various
grievances, and for assisting another inmate in prosecuting a civil rights lawsuit."
*Id*.  Like in *Cromer*, the Sixth Circuit determined that the plaintiff also failed to
show that he had engaged in protected activity:

> [The plaintiff] has no liberty or property interest in his position as an
> inmate representative on the warden's forum.  Nor is he entitled to a
> particular housing assignment.  While a prison inmate may not be
> transferred in retaliation for engaging in protected First Amendment
> activity, [the plaintiff] has no First Amendment right to represent other
> inmates in presenting their grievances *absent a showing that the
> inmates receiving the assistance would otherwise be unable to pursue
> legal redress*.  As the district court correctly points out, [the plaintiff]
> has not demonstrated that the inmates he represented on the warden's
> forum could not have been represented by another inmate, or that they
> could not bring any concerns they may have to the attention of prison
> officials without [his] assistance.  Because [the plaintiff] has not
> established that he was engaging in protected First Amendment activity
> as a warden's forum representative, his retaliation claim against these
> three prison officials fails.

*Id*. at 519-520 (cleaned up) (emphasis added).

In response, Kennedy cites *Berkshire v. Dahl*, 928 F.3d 520 (6th Cir. 2019).

In this case, the plaintiff was a Michigan prisoner who "experienced a parade of horribles." *Id*. at 524. The plaintiff there suffered from mental health issues that began to improve during his placement in the Residential Treatment Program (RTP). *Id*. "In RTP, [the plaintiff] worked as a Housing Unit Representative on a 'Warden's Forum,' in which he brought inmate complaints to the attention of prison staff." *Id*.

At some point during his tenure as a housing unit representative, a doctor "unilaterally raised [his] Global Assessment Functioning ("GAF") score, which mental-health professionals use to measure a patient's level of functioning, to a score that made [him] ineligible to stay in RTP." *Id*. The plaintiff alleged that the doctor raised his GAF in retaliation for complaints he made as a housing unit representative. *Id*. After his removal from the RTC, the plaintiff's mental health began to rapidly decline. *Id*.

When discussing the plaintiff's retaliation claim, the Sixth Circuit addressed both *Cromer* and *VanDiver* and concluded that "[t]aken together, the *Cromer* and *VanDiver* plaintiffs' First Amendment claims failed not because Warden's Forum-related activity is not protected per se; rather, the plaintiffs' claims failed because they had not shown that other inmates (whom the plaintiffs assisted) had no other reasonable alternatives for assistance." *Id*. at 533. The Sixth Circuit explained that the plaintiff in *Berkshire* was different because "serving as the Warden's Forum

16

representative count[ed] as evidence" that the plaintiff's "assistance to other inmates was necessary." *Id*. at 531.  Additionally, "prison officials directed other inmates to [the plaintiff] for help with complaints" and the inmates the plaintiff "helped 'were either severely mentally ill, they couldn't read or write, or . . . they were too medicated to even . . . write anything down.' " *Id*. (internal record citation omitted); *see also Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000) ("Such assistance is protected, however, when the inmate receiving the assistance would otherwise be unable to pursue legal redress.").

Here, as noted above, Kennedy has produced affidavits from two fellow prisoners, Carter and Cohen, who swore that Kennedy's assistance was integral in their ability to present grievances to prison officials.  *See* ECF No. 1, PageID.19-20.  Thus, as in *Berkshire*, Kennedy has produced evidence that his activity on the Warden's Forum included necessary assistance to other inmates like Carter and Cohen.

Moreover, MDOC policy explicitly states that a housing unit representative is supposed "to assist housing unit staff in identifying and resolving problems which exist in the unit."  (ECF No. 52, PageID.639).  The same policy also "encourage[s] [representatives] to solicit input from those they represent and to give consideration to the views expressed."  (*Id*., PageID.640).  This policy shows that prisoners were supposed to share their problems with their housing unit

17

representatives, and that the representatives were then supposed to present these problems to MDOC staff so they could work together toward resolution. Kennedy served as both a housing unit representative and a member of the Food Service Committee. As such, he was expressly designated, as explained in MDOC policy, as the individual who was supposed to help less well-situated prisoners present their issues regarding food quality to MDOC staff up to and including the Warden of JCF. *See Berkshire*, 928 F.3d at 531 (emphasizing that evidence showed that "prison officials directed other inmates to [the plaintiff] for help with complaints").

Overall, the record contains sufficient evidence for a reasonable juror to conclude that Kennedy's participation in the Warden's Forum is protected conduct meeting the first element of a retaliation claim. At the very least, Curtis has not met his summary judgment burden on this ground.

c. Adverse Action

Curtis also argues that summary judgment is proper because Kennedy has failed to establish that his two-week placement in segregation while awaiting a hearing on his misconduct ticket was an adverse action sufficient to satisfy the second element of a retaliation claim.

The Sixth Circuit has held that "actions that result in more restrictions and fewer privileges for prisoners are considered adverse." *Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010). More specifically, the Sixth Circuit also "has held that

18

restricting a prisoner's housing by placing him in administrative segregation

constitutes an adverse action." *Id*. at 474.  Moreover, "administrative segregation

is not the only kind of housing restriction that can constitute an adverse action[.]"

*Id*.  Other kinds of segregated housing can constitute an adverse action so long as

the housing is comparable to administrative segregation. *Id*. (citing *Thaddeus–X*,

175 F.3d at 396 and *King v. Zamiara*, 150 F. App'x. 485, 494 (6th Cir. 2005)).

While in segregation, Kennedy was "denied the ability to exercise,"

subjected to worse "cell conditions," and faced indifference "to [his] medical

condition."  (ECF No. 58-5, PageID.1059).  Thus, the record shows that Kennedy

was placed in an environment with more restrictions and fewer privileges,

regardless of whether, as Curtis argues, the type of segregation Kennedy was in

was called "administrative segregation."  A reasonable juror could find that

Kennedy's placement in segregation pending a hearing constituted an adverse

action.[4]  Accordingly, Kennedy has overcome his summary judgment burden on

this element.

---

[4] Additionally, the Sixth Circuit suggested in *Brown v. Crowley*, 312 F.3d 782, 789
(6th Cir. 2002), *cert. denied*, 540 U.S. 823 (2003) that the issuance of a major
misconduct ticket alone may constitute an adverse action because "[a] reasonable
jury could conclude that being subjected to the risk of such severe sanctions for
raising a legitimate complaint would deter a person of ordinary firmness from
continuing to engage in that protected conduct."  (internal quotation marks and
citation omitted).

d.   Causation

Curtis also argues that Kennedy cannot establish causation as a matter of law.  In response, Kennedy outlines six categories of evidence that support his version of events and demonstrate causation: (1) statements that Kennedy testified were made by Mask and Houtz; (2) Kennedy's removal as a housing unit representative; (3) temporal proximity between Kennedy's conduct and his placement in segregation; (4) Curtis' motive (he wanted the "tense and scary situation" regarding the food issues to be resolved); (5) lack of alternative basis for Kennedy's placement in segregation; and (6) Curtis' attempts to shift responsibility for Kennedy's placement in segregation onto his supervisors.

"[T]o prove causation it is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured."  *Coleman v. Mohlman*, No. 2:19-cv-13494, 2020 WL 5648352, at *6 (E.D. Mich. Aug. 24, 2020), *report and recommendation adopted*, 2020 WL 5645715 (E.D. Mich. Sept. 22, 2020) (citing *Nieves*, 139 S. Ct. at 1722).  "The retaliatory motive must be a 'but-for' cause to the adverse action."  *Id*.

Kennedy has highlighted evidence that a reasonable juror could determine establishes a but-for causal connection—meaning that Curtis would not have written the misconduct ticket and placed him in segregation but for Kennedy's protected speech.  Moreover, the Sixth Circuit has explained that their "cases leave

20

no doubt that this causation element (unlike the protected-speech element) presents a pure fact question about the reason(s) for the adverse action." *DeCrane v. Eckart*, 12 F.4th 586, 602 (6th Cir. 2021); *see also Fakhoury v. O'Reilly*, 837 F. App'x 333, 340 (6th Cir. 2020) (explaining that whether a plaintiff can establish an adverse action or causation "are ordinarily factual questions for a jury"). The Sixth Circuit has also acknowledged that "[m]otive is often very difficult to prove with direct evidence in retaliation cases" and that "[c]ircumstantial evidence may therefore acceptably be the only means of establishing the connection between a defendant's actions and the plaintiff's protected conduct." *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012).

One noteworthy piece of circumstantial evidence in Kennedy's favor is the short amount of time between his statements at the Warden's Forum and Curtis' unfounded misconduct ticket, given that the Sixth Circuit has held that "temporal proximity alone may be 'significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.' " *Muhammad v. Close*, 379 F.3d 413, 417-418 (6th Cir. 2004) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004)); *see also King*, 680 F.3d at 695 ("We have previously considered the temporal proximity between protected conduct and retaliatory acts as creating an inference of retaliatory motive."); *Coleman*, 2020 WL 5648352, at *6 ("The Sixth Circuit has held that temporal proximity between

21

the protected conduct and the adverse action by the state actor may be sufficient evidence of causation.") (internal quotation marks and citation omitted).  The key events in this case took place over the course of approximately three days beginning on or around August 29, 2017, and ending on or around August 31, 2017.

This three-day period was when the prisoner complaints regarding food quality at JCF seemingly reached their boiling point and when Kennedy alleges to have been threatened by Curtis and then placed in segregation.  The tight timeline in this case lends support to Kennedy's temporal proximity theory of causal connection.

Curtis, on the other hand, relies on *Smith v. Campbell*, 250 F.3d 1032 (6th Cir. 2001) and *Skinner v. Bolden*, 89 F. App'x 579 (6th Cir. 2004) (unpublished order) to argue that temporal proximity is not enough to establish causation. However, both of these cases are distinguishable.

The plaintiff in *Smith* brought a retaliation claim alleging that his transfer from minimum security status at one facility to maximum security status at another facility was done "in retaliation for the grievances he filed against prison officials." 250 F.3d at 1034.  To establish causation, the plaintiff relied on a temporal proximity theory.  *Id*. at 1038.  To support this theory, the plaintiff relied solely on comments made by a prison official shortly before his transfer.  *Id*.  However, the

Sixth Circuit found that the "comments d[id] not demonstrate a causal connection between his filing of grievances and the decision to transfer him because it is uncontroverted that [the comment maker] was not the decisionmaker in this case." *Id*. The Sixth Circuit further explained that the defendants would be entitled to summary judgment regardless of the existence of temporal proximity because they "show[ed] that the same action would have been taken in the absence of protected activity." *Id*.

In *Skinner*, the Sixth Circuit cited to *Smith* to affirm the district court's rejection of the plaintiff's "retaliation claims because he did not establish an adequate nexus between his protected conduct and the alleged retaliation." 89 F. App'x at 579 (citing *Smith*, 250 F.3d at 1037-1039). The Sixth Circuit also mentioned the district court's secondary reason for rejecting the plaintiff's retaliation claims, which was "that the defendants would have taken the same actions in the absence of any protected activity." *Id*. Ultimately, the Sixth Circuit concluded that "[w]ithout more, . . . [the plaintiff's] conclusory allegations of temporal proximity [were] not sufficient to show a retaliatory motive." *Id*. at 579-580.

Here, unlike in *Smith*, Curtis was the decisionmaker behind the alleged adverse action. Curtis chose to write a misconduct ticket that he knew at the time of writing was unlikely to be sustained by a hearing officer. Furthermore, Curtis

23

reportedly told Kennedy that he had "pissed the wrong people off by making complaints about the food and I'm one of those people" and that Kennedy was "not untouchable because you are a Warden's Forum Member.  If you keep making trouble then I'm going to show you're touchable and make trouble for you."  (ECF No. 1, PageID.4 (Complaint); *see also* ECF No. 58-5, PageID.1055-1056 (Kennedy Deposition)).  These statements, if true, constitute direct evidence that Curtis wrote the misconduct ticket in retaliation for Kennedy's protected conduct.

Because the misconduct ticket alleged a violation of a nonbondable offense, Curtis further knew that Kennedy would be held in segregation until a hearing occurred.  Whether Curtis wrote the misconduct ticket at the behest of his superiors is irrelevant because "[i]ndividuals who aid in the implementation of an adverse action at the instructions of a superior will be liable along with their superior if they knew or should have known that the adverse action was unlawful."  *King*, 680 F.3d at 696.

Moreover, while Curtis did write a misconduct ticket against Swackhammer for the same alleged misconduct as Kennedy, this action could have been taken to cover up the retaliatory motive that Curtis had for writing Kennedy's misconduct ticket.  Or, it could not have been.  But the submitted evidence makes the inference of a cover up one that a reasonable juror could make.  *See Brown v. Crowley*, 312 F.3d 782, 790 (6th Cir. 2002), *cert. denied*, 540 U.S. 823 (2003) ("Although the

evidence presented by the defendants is relevant to the question of whether they 'would have taken the same action in the absence of the protected activity,' it is not sufficient to establish as a matter of law that there was no causal connection between the protected conduct and the adverse action.").

The Sixth Circuit recently reiterated that " 'extremely close temporal proximity' between the protected activity and the adverse action can, in some 'rare[ ]' cases, 'permit an inference of retaliatory motive[.]' " *Bey v. Hissong*, No. 21-2883, 2022 WL 3969831, at *4 (6th Cir. Apr. 19, 2022) (quoting *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010)).  "Often evidence in addition to temporal proximity is required to permit the inference." *Id*. (quoting *Vereecke*, 609 F.3d at 401)  Here, there is not only extremely close temporal proximity between the events in question, but also direct evidence of retaliation and additional circumstantial evidence of a retaliatory motive (the ongoing cafeteria attendance crisis, Kennedy's removal as housing unit representative, and the fact that the misconduct ticket was written despite having no evidentiary support).  A reasonable juror could thus conclude that the issuance of the misconduct ticket was causally related to Kennedy's activity as a housing unit representative.  In other words, it cannot be said as a matter of law that Kennedy

has failed to establish causation.[5]

### B.    Qualified Immunity

#### 1.    Standard

Qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Created to protect government officials from interference with their official duties, qualified immunity "is an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  It gives officials "breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (punctuation modified).  After a defending official initially raises qualified immunity, the plaintiff bears the burden of showing that the official is not entitled to qualified immunity.  *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013).

The Sixth Circuit has generally "use[d] a two-step analysis: (1) viewing the

---

[5] In reply, Curtis argues that he would have written the misconduct ticket regardless of whether Kennedy had engaged in the protected conduct, which would defeat causation.  However, given the uncontroverted fact that he chose to write the ticket knowing that the informant had declined to support it, a jury could infer that such a ticket would not be written in the absence of a retaliatory motive.

facts in the light most favorable to the plaintiff, [it] determine[s] whether the
allegations give rise to a constitutional violation; and (2) [it] assess[es] whether the
right was clearly established at the time of the incident." *Id.* The steps may be
considered in either order, so "[i]f the court concludes that no constitutional
violation has occurred, there is no need to address whether the alleged right was
clearly established." *Kinlin v. Kline*, 749 F.3d 573, 577 (6th Cir. 2014).

2. Application

Kennedy has cleared the qualified-immunity hurdle.

As explained above, Kennedy's version of the events give rise to a
constitutional violation of retaliation under the First Amendment: (1) he was
engaged in protected First Amendment conduct when he presented grievances at
the Warden's Forum while in his role as a housing unit representative; (2) his
placement in segregation constituted an adverse action; and (3) Curtis wrote the
misconduct ticket leading to Kennedy's placement in segregation because of
Kennedy's Warden's Forum activity.

Moreover, the right to present grievances to prison officials and the
coexistent protection from retaliation are long established First Amendment
principles. Critically, the Sixth Circuit stated back in 1996 that

> Noble's second argument is that *Defendants retaliated against him for
> filing grievances on his own behalf and for fellow inmates*. This alleged
> conduct also *comprises a violation of clearly established constitutional
> law*. As an individual in the custody of the state, Noble retains his rights

27

to free speech, and is entitled to petition the state for redress of grievances.

*Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir. 1996) (emphasis added).

Additionally, as stated above, the purpose of qualified immunity is to give government officials like prison corrections officers "breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton*, 571 U.S. at 6 (punctuation modified). The claim here is not that Curtis made a mistaken judgment that another person could have made in his shoes. The claim is that Curtis intentionally set out to punish Kennedy and deter him from engaging in speech protected by the First Amendment because Curtis—or perhaps his superiors—did not like what Kennedy was saying. This is not the type of conduct that the doctrine of qualified immunity shields. As the Supreme Court has said, qualified immunity does not protect officials "who knowingly violate the law." *Id.*

In light of the above, the undersigned concludes that Curtis is not entitled to qualified immunity on Kennedy's retaliation claim.

### C.    In sum

Summary judgment is inappropriate because there are material questions of fact as to each of the elements of Kennedy's retaliation claim. Kennedy and Curtis offer differing versions of the events, and Kennedy has produced evidence in support of his version sufficient to survive summary judgment. Determining the

credibility of witnesses and weighing conflicting testimony is outside of the purview of a court considering a motion for summary judgment. Curtis has not met his summary judgment burden nor is he entitled to qualified immunity.

V.     Conclusion

For the reasons stated above, the undersigned RECOMMENDS that Curtis' second motion for summary judgment, (ECF No. 52), be DENIED.


Dated: January 24, 2023                    s/Kimberly G. Altman___
Detroit, Michigan                          KIMBERLY G. ALTMAN
                                           United States Magistrate Judge


**NOTICE TO PARTIES REGARDING OBJECTIONS**

The parties to this action may object to and seek review of this Report and Recommendation.  Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule

29

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the court determines that any objections are without merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 24, 2023.

s/Carolyn Ciesla
CAROLYN CIESLA
Case Manager

30